**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| SARAH LEAUTAUD,<br><br>          Plaintiff,<br><br>vs.<br><br>MARKET EXPRESS, INC., a Utah corporation,<br><br>          Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No.  2:06CV286 DAK** |

This matter is before the court on Defendant Market Express, Inc.'s ("Market Express") Motion for Summary Judgment and on Plaintiff Sarah Leautaud's ("Ms. Leautaud") Motion for Partial Summary Judgment.   A hearing on the motions was held on September 11, 2007.   At the hearing, Ms. Leautaud was represented by Michelle Swift and Robert Wilde.  Defendant Market Express was represented by Judith D. Wolferts.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.   Since taking the motions under advisement, the court has further considered the law and facts relating to the motions.   Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  BACKGROUND

On July 22, 2005, Ms. Leautaud was the victim of an unfortunate incident, which forms

the primary basis for this lawsuit.   In summary, Ms. Leautaud was at her job at the Market

Express, stocking a locked cooler in the store.   A male customer, with whom she was acquainted

and with whom she had previously been talking, Stacey Marvidikis ("Mr. Marvidikis"), entered

the cooler and proceeded to kiss Ms. Leautaud and touch her inappropriately.   A security camera

shows that Mr. Marvidikis was in the cooler with Ms. Leataud for approximately one minute and

thirty-seven seconds.   Mr. Marvidikis had requested the key to the locked cooler from another

Market Express employee, Kelly Madsen ("Mr. Madsen").  Before the incident, Mr. Madsen had

seen and heard Ms. Leautaud and Mr. Marvidikis chatting and was under the impression that Mr.

Marvidikis was a friend of Ms. Leautaud's.

As a result of this incident, police charged Mr. Marvidikis with lewdness, and Market

Express terminated Mr. Madsen's employment due to his lack of judgment in providing the key

to Mr. Marvidikis.  Ms. Leautaud continued to work at Market Express for three more regularly

scheduled workdays, and then suddenly quit because she was upset that Market Express had not

obtained a restraining order prohibiting Mr. Madsen and Mr. Marvidikis from coming onto its

premises.

Ms. Leautaud subsequently filed a Charge with the EEOC, setting forth the above

incident.   She then filed the instant lawsuit, asserting the following claims against Market

Express: disparate treatment based on gender in violation of Title VII; (2) hostile work

environment in violation of Title VII; (3) respondeat superior; (4) retaliation in violation of Title

VII; and (5) constructive discharge.   She has now conceded her claim for retaliation.

Market Express now seeks summary judgment on Ms. Leautaud's claims, and Ms.

Leautaud seeks partial summary judgment on Market Express' affirmative defenses under

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

## II. FACTS

Ms. Leautaud began working for Market Express in Price, Utah, in October 2004.  Her

first position was at the Market Express Carbon Avenue store (the "south store"), where her work

hours were from 9 p.m. to 4 a.m., and her duties included cashiering, cooking, cleaning, and

making sales.   She testified that she never saw any conduct by south store employees that she

thought was inappropriate.   After about two months of working at the south store, she asked

owner Angelo Kiahtipes ("Mr. Kiahtipes") for a transfer to another Market Express store, the

north store, so that she could work fewer hours.   She told Mr. Kiahtipes that her current hours

were tough with her three children and that working two hours less would be better for her.   She

was then transferred to the north store in December 2004 and began working the 9 p.m. to 2 a.m.

shift, as she had requested.

According to Mr. Kiahtipes, there is a manager at both stores, and they are "the only titled

people, other than the cashiers."  He stated that, although more experienced employees may take

the lead when the two managers are not around, these other employees "have no authority other

than what the cashier has."   Paula Axelson ("Ms. Axelson") was the manger of the north store,

and Lona Every ("Ms. Every") was the manager of the south store.   According to Ms. Axelson,

she was the only manager/supervisor at the north store, and if there was a problem or question,

employees were to call or report to her or to Mr. Kiahtipes.  Mr. Kiahtipes testified that

employees know they can call him or the managers with problems at any time, and that his home

phone and the managers' "phones are on all the time.  We get calls all the time."

Tracy Felice ("Ms. Felice") worked at the north store, and she first worked with Ms. Leautaud at the south store and then had moved to the north store in November or December 2004.  Ms. Felice was a "gas till.  She would watch the [gasoline] pumps, make coffee, stock the cupboards up front, sweep and mop."  Mr. Kiahtipes described Ms. Felice as having "worked for me for a long time.   Very trusted, very good hand."   Ms. Felice testified that she never observed anything that she thought was sexually inappropriate take place at either the north or south Market Express stores.  She testified that she never observed Mr. Madsen do anything that she thought was sexually inappropriate.  She also testified that if other employees told her about something they did not like, she always told them to tell Mr. Kiahtipes or a manager.

Ms. Leautaud has attempted to create a disputed fact about whether Ms. Tracy Felice was a manager/supervisor for Title VII purposes.  Given all the evidence presented, however, no reasonable jury could find that Ms. Felice was a manager or supervisor for Title VII purposes.  While she called herself the "assistant to the manager," the undisputed evidence demonstrates that she had no authority over other employees.

Mr. Kiahtipes testified that it is "everybody's  responsibility to report  sexual harassment to him.   His cell phone number is posted at both the north and south stores, and most of his employees "know it by heart."  Employees can also report it to a manager or Market Express office staff.

**KELLY MADSEN**

Two or three months after Ms. Leautaud transferred to the north store, in February or

March 2005, Kelly Madsen ("Mr. Madsen") began working for Market Express and was assigned to the north store.   Ms. Leautaud had never met Mr. Madsen before they worked together at the north store, and Ms. Axelson did not know him prior to his employment at the north store.   Mr. Madsen was not a supervisor, and his duties at the north store were about the same as Ms. Leautaud's, e.g., cashiering, stocking shelves, and cleaning.   Mr. Madsen testified that when he worked the graveyard shift and the female employees were taking out the trash at night, he would "walk the girls to the end of the building."

Ms. Leautaud has attempted to create a disputed fact about whether Mr. Madsen was her supervisor, but she has failed to do so.   No reasonable jury could find that Mr. Madsen had any supervisory authority over Ms. Leautaud for Title VII purposes.

**MS. LEAUTAUD'S ALLEGATIONS REGARDING MR. MADSEN**

Ms. Leautaud contends that Mr. Madsen's conduct was inappropriate.[1]  Specifically she claims that a co-worker, Alexis, was uncomfortable with Mr. Madsen watching her while Alexis took out the garbage at night and that Alexis told Ms. Leautaud that Mr. Madsen made comments that Alexis did not like.   Ms. Leautaud admits, however, that she had no personal knowledge of this and just "heard" about it from Alexis.

Ms. Leautaud also claims that about two months after Mr. Madsen began working at the

---

[1]Market Express has marshaled some evidence  regarding Ms. Leautaud's alleged sexual behavior at work, including her bringing a sex-toy catalog to work and participating in sexual banter in the workplace, including with Mr. Madsen and other customers.  Ms. Leautaud, however, has denied these allegations and  has created genuine issues of material fact regarding such allegations.  Thus, the court will view the evidence in the light most favorable to Ms. Leautaud, for purposes of this motion, and accordingly, the court will assume that Ms. Leautaud did not engage in such conduct.

north store, she was bending down to get change out of the safe when he put his hand on her head and said "while you're down there, will you give me a blow job?" (the "Safe Incident").  She told him that "I didn't appreciate it very much."   Ms. Leautaud contends that she told Ms. Felice about this incident, but Ms. Felice denied that Ms. Leautaud had ever mentioned it.   And, as previously noted, Ms. Felice was not a manager or supervisor whose knowledge is attributed to the employer.

Mr. Leautaud also contends that she was wiping down the cooler doors about a week after the Safe Incident, and Mr. Madsen told her that he "liked the view of my ass while I was washing the cooler doors" (the "Doors Incident").   She told him this "wasn't very nice, and I didn't appreciate it as well."   There is no evidence that Ms. Leautaud reported this Doors Incident to anyone.

She also claims that Mr. Madsen commented about a customer who was wearing a "really low cut" shirt, saying he liked the customer's breasts and wished she would come in wearing a bikini.   She testified that she did not report this to anyone, but told Mr. Madsen "that wasn't very couth.  That I don't want to hear about other women's bodies."   She also claims that Mr. Madsen told her about his sex life with his wife.   She also alleges that he watched her when she took out the trash.   She also claims that Mr. Madsen told her he "was being charged for sexual harassment on his daughter for pornography."   According to Mr. Madsen, his daughter had happened to come across some pornography on his computer.   There is no evidence, however, that Ms. Leautaud complained or otherwise reported these incidents to anyone.

Ms. Leautaud also claims that Mr. Madsen had a palm pilot and once showed her and a

customer pornography on it.   She claims that she "talked to" Ms. Felice about the pornography on Mr. Madsen's palm pilot.  She also contends that she told Ms. Felice and Ms. Axelson that she felt "uncomfortable" working with Mr. Madsen, although she did not provide any details regarding the nature of this conversation or when it occurred.  Other than noted above, Ms. Leautaud cannot recall whether she reported any other incidents to Ms. Axelson or Ms. Every.

In her deposition, Ms. Leautaud testified that she bases her Title VII claims on: (a) Mr. Madsen's pornography situation with his daughter, and (b) an incident involving Mr. Madsen that occurred at a McDonald's restaurant when he was employed there.  This incident is more specifically discussed below.   Ms. Leautaud admits, however, that she had just "heard about" this McDonald's incident.   She cannot recall any conduct toward other employees by Mr. Madsen that she thought was inappropriate.

**OTHER COMPLAINTS ABOUT MR. MADSEN**

Ms. Axelson testified that the only complaint she had ever received about Mr. Madsen prior to July 22, 2005, concerned his walking outside with a co-worker, Alexis, when Alexis took out the garbage.   Alexis told Ms. Axelson that [Mr. Madsen] made her nervous" when he watched her take the trash out.   Ms. Axelson spoke to Mr. Madsen about it, and he stated that he was just watching out for her safety and that he would not do it anymore.   Mr. Madsen never did this after Ms. Axelson spoke to him.

Other than this incident regarding Mr. Madsen watching Alexis when she took out the trash, Ms. Axelson testified that the only other complaints made about Mr. Madsen were related to his job performance.

**MR. MADSEN'S PREVIOUS EMPLOYMENT AT MCDONALD'S**

Ms. Leautaud has emphasized–somewhat unfairly– an unfortunate incident in which Mr.
Madsen was involved when he was employed at McDonald's.  While he was working a shift at
McDonald's, a person pretending to be a police officer called McDonald's, claiming that a
female employee had stolen something.  The caller then "ordered" Mr. Madsen to conduct a
physical search of the female.  The caller talked to both Mr. Madsen as well as to the female
employee, and gave them options as to what to do.   The female agreed that out of the options
presented, she would permit the search.[2]  These hoax calls were made to numerous businesses
throughout the United States at around the same time, and many individuals were victimized
when they unwittingly complied with the caller's orders.[3]   This court finds that this incident has
very little relevance to this lawsuit.

**STACEY MARVIDIKIS**

Mr. Marvidikis is an acquaintance of Ms. Leautaud and the customer of Market Express
who is the perpetrator of the "July 22, 2005 Incident" mentioned above.   Ms. Leautaud first
knew Mr. Marvidikis in 1995, when she was dating his brother, Scott.   She testified that she ran
into Mr. Marvidikis in about November 2004, when she was working at the south store.   She
could smell alcohol on him, and she testified that "he followed me out to my car and tried to kiss
me once there too.  But because he was drunk, I just kind of pushed it off and got in my car and

---

[2]  As noted in Market Express' Memorandum in Opposition to Plaintiff's Motion for
Partial Summary Judgment, see page v n.1, neither Market Express nor the court intent to imply
that the female co-worker was at fault in what occurred at McDonald's.  The incident speaks for
itself, and many people were victimized by this hoax.

[3]  The court takes judicial notice of the fact that these strip-search hoaxes were
perpetrated across the country at fast food restaurants, including McDonald's.  *See e.g.*, "Bizarre
'Strip-Search Hoax' Case Before 11th Circuit at www.law.com.

left."  Ms. Leautaud admits that she did not tell anybody about this incident.

**THE JULY 22, 2005 INCIDENT**

In the early morning hours of July 22, 2005, Ms. Leautaud was working her regular shift at the north store.   She was in the back of the store stocking the cooler, when Mr. Madsen called her out to help him because the Greyhound bus had arrived.   He often called her out to help with the cashier's position when this bus arrived with its passengers, which was usually around 1:00 a.m.

When she arrived at the front of the store to help Mr. Madsen, she saw that Mr. Marvidikis was standing next to the counter talking to Mr. Madsen.  Mr. Madsen had never met Mr. Marvidikis until that evening.   Mr. Madsen testified that on that evening, Mr. Marvidikis and Ms. Leautaud "were standing there talking and joking."

Ms. Leautaud testified that she then went around the counter and started helping customers at the cash register.   After she finished helping the customers from the Greyhound bus, she stood there, talking to Mr. Marvidikis.  She testified that July 22, 2005 was the first time she had seen Mr. Marvidikis since she had seen him at the south store when he followed her to her car.

At the north store Market Express, there is a Burger King restaurant located inside the store.[4]   Ms. Leautaud testified that after she and Mr. Marvidikis had been talking to Mr. Madsen for a few minutes, "one of the Burger King workers yelled across for [Madsen] to come over to Burger King.   So he did.  After he left, Ms. Leautaud continued to stand at the cash register.

---

[4] Indeed, it was because Mr. Kiahtipes was concerned that Burger King employees could access the Market Express storage cooler and take beer that the cooler was kept locked.   It is undisputed that all north store cashiers had access to the cooler key.

She testified that she was too nervous to come out from around the counter, because [Mr. Marvidikis] was there, and he made her nervous."   Ms. Leautaud stated that when Mr. Marvidikis "kind of moved," she thought to herself that she would take the "opportunity to go around the counter."   She claims that she was trying to let Mr. Madsen know that he needed to come back "so that I could get my work finished so that I could get home."   Ms. Leautaud testified that she "was yelling at him, and he would hold up a finger."   She claims that she told him "I need to get in the cooler and stock the cooler.  It's not going to stock itself."   She claims that Mr. Madsen said "he'd be just a minute."

Ms. Leautaud states that she decided to go around the counter and was going to yell and tell Mr. Madsen that she was going to the cooler, but as she started to walk away, Mr. Marvidikis grabbed a novelty item off the counter and turned to ask her about it, and she stopped to tell him what it was.   She said that at that point, "he wrapped his arms around me and kissed the side of my face."  She pushed away from him, "scooted down the counter, and was yelling for [Mr. Madsen] to come, gesturing for [him] to get back over here, frantically."   She said that she yelled "Kelly [Mr. Madsen], I need you back over here.  Now.  I need to get my work done.  I was very angry."

Ms. Leautaud testified that she then noticed that a regular customer had entered the store, so she went back behind the counter.  She proceeded to help this customer.   Mr. Madsen returned shortly thereafter, and Ms. Leautaud stood and talked to Mr. Madsen for a minute.   She "told [Mr. Madsen] what I needed to get done and finished doing."   She admits that was all she talked to Mr. Madsen about and that she did not let Mr. Madsen know that she was uncomfortable around Mr. Marvidikis or that she needed any help dealing with Mr. Marvidikis.

10

Mr. Madsen's testimony is consistent with Ms. Leautaud's: he testified that all Ms. Leautaud told him was that she was going to go stock the cooker.   She said nothing to him to lead him to believe that she was trying to avoid Mr. Marvidikis.   He had not seen Mr. Marvidikis touching or kissing Ms. Leautaud.

When Ms. Leautaud eventually went into the cooler, she locked the door because she did not feel safe.   Mr. Madsen testified that after Ms. Leautaud left to finish stocking the cooler, Mr. Marvidikis talked to him for a couple more minutes.   Mr. Madsen testified that he got the impression that Mr. Marvidikis wanted to startle her, "so I gave him access to go back to the back.   Joking with her, you know."

Ms. Leautaud testified that after she had been in the cooler for a while, Mr. Marvidikis entered the cooler, holding the key in his hand.   She was afraid and upset, but did not try to get away because she "couldn't get around him if I tried."   She testified that he came over and put his arm around her from behind and cupped her breasts.   He was hugging and kissing her, and then he turned her around and French kissed her.

She testified that during this time, she was frightened and kept pushing away from him, screaming.   She told Mr. Marvidikis that there were cameras in the cooler and that he needed to get out of there and leave her alone.   After he left the cooler, Ms. Leautaud waited for a few minutes and went out and made sure the door was locked again.   She then went back in and finished stocking the cooler.   She cannot recall how much longer she spent stocking the cooler. After finishing, she cleaned the bathrooms, filled the ice machines, and then "tilled out" with Mr. Madsen.   She did not tell Mr. Madsen what had happened in the cooler.   After "tilling out," she left the store.

11

She then drove to the south store and talked to another employee there.  She told him what had happened and asked him who he thought she should call–Mr. Kiahtipes or Paula.  She decided to call Mr. Kiahtipes.  Before she could call the police, some police officers happened to come into the north store.  She approached them and told Officer Susan Hyde what had happened.  Officer Hide took Ms. Leautaud outside the store, and they talked.  Officer Hyde told Ms. Leautaud to contact Mr. Kiahtipes.  Ms. Leautaud did so, and Officer Hyde told Ms. Leautaud that she would obtain a statement from Mr. Madsen.

The statement that Officer Hyde obtained from Mr. Madsen on July 22, 2005 states:

[Ms. Leautaud] was talking to this man.  I thought they were pals.  It sounded like she knew him.  After she had helped me with the Greyhound bus, she went back to the cooler.  He went looking for her.  He found the door locked, me thinking they were good pals I let him have the keys to get like I have done with David that works at 911 dispatch.  When he came out he gave me the keys back and talked for a few minutes and then left.  When Sarah came out she didn't say a word about it.

Mr. Marvidikis provided a statement to police, and he refers to Ms. Leautaud as a "friend" and states that he obtained the key to the cooler from Mr. Madsen by telling him that he wanted to talk to Ms. Leautaud.  Price City charged Marvidikis with lewdness.

**AFTERMATH OF THE JULY 22 INCIDENT**

The next morning, Ms. Leautaud called Ms. Axelson about the incident with Mr. Marvidikis.  Mr. Kiahtipes had contacted Ms. Axelson earlier and had told her to do everything "we needed to do to help and take care of [Ms. Leautaud].  When Ms. Leataud went to the Market Express office to talk to Ms. Axelson, they viewed the surveillance video and then called the police.  The viewed the surveillance video again with a police officer present.  The video from the north store surveillance camera had recorded Mr. Marvidikis' movements in and out of

the cooler.   It reflects that he was in the cooler for 1 minute thirty-seven seconds.

After the July 22, 2005 incident, Mr. Kiahtipes terminated Mr. Madsen's employment, after first telling Ms. Axelson to "take Kelly off the schedule and set up a meeting with me and him before he ever works again.   At the meeting, Mr. Kiahtipes asked Mr. Madsen for his side of the story.  According to Mr. Kiahtipes' deposition testimony:

> He come in my office.  And I asked him his side of the story.   And he told me
> basically the truth as I know it to be.   You know, that he give the key to this guy
> who was talking to [Ms. Leautaud].  And that they had been talking for awhile,
> and he thought it was OK for him to go back and talk to her some more.   I told
> hm that's not acceptable.  So I terminated him.

Mr. Kiahtipes felt that Mr. Madsen had made a serious error in judgment in giving Mr. Marvidikis the key to the cooler.   After the incident, Ms. Leautaud continued working for Market Express.   She testified that she "liked the job, and it worked well with my family, and the hours worked well."   Ms. Axelson asked Ms. Leautaud after the July 22 incident whether she was comfortable working at the north store or whether she wanted to go back to the south store. Ms. Leautaud decided to stay at the north store and returned to work there on her next scheduled workday, Monday, July 25, 2005.

She worked each day that week until she abruptly quit on Thursday, July 28, 2005. Ms. Leautaud testified that she quit after she received a telephone call from Ms. Felice, who told Ms. Leautaud that Mr. Kiahtipes had told Ms. Felice that Mr. Madsen could come into Market Express stores as a customer.   Ms. Leautaud was upset because she wanted Market Express to obtain a court order prohibiting Mr. Madsen from coming on its property or into its stores.

Mr. Kiahtipes had spoken to the Price City Chief of Police about obtaining a restraining order against Mr. Madsen and/or Mr. Marvidikis and was told that he could not do so.   He

testified that:

> He said you can't get a restraining order.   He says maybe [Ms. Leautaud] would
> have to go try and get a restraining order.  He told me she wouldn't get one
> anyway because it's not reoccurring and there was no stalking is what he told me.

Ms. Leautaud testified that she attempted to obtain restraining orders against Mr. Marvidikis and

Mr. Madsen but was unable to do so and was told by police that she had to have had some

relationship to them, such as marriage or having had sex to obtain an order.   She admits that

Market Express had told her that her work there was appreciated and that she is welcome to come

back to work at any time.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56©;  *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).  In reviewing the factual record, we construe all facts and make reasonable inferences in

the light most favorable to the non-moving party.  *See Byers v. City of Albuquerque*, 150 F.3d

1271, 1274 (10th Cir.1998).

### IV. DISCUSSION

Market Express argues that summary judgment should be granted on all of Ms.

Leautaud's claims because (1) she has failed to exhaust her administrative remedies as to all

claims except her claim based on the July 22, 2005 incident with Mr. Marvidikis; (2) she has

failed to create a genuine issue as to whether she was subjected to a hostile work environment

claim based on the July 22, 2005 incident; (3) even if she had exhausted her claims, she has not

created a genuine issue concerning whether she was subjected to a hostile work environment; (4)

even if she had exhausted her claims, she has not created a triable issue as to whether she was

constructively discharged; and (5) granting summary judgment is not unconstitutional, as argued

by Ms. Leautaud.  As explained below, the court agrees with Market Express that it is entitled to

summary judgment on all Ms. Leautaud's claims.

**A.     Ms. Leautaud Failed to Exhaust Her Administrative Remedies As to all Claims
        Except Her Claim Based on the July 22, 2005 Incident**

Plaintiff's Charge of Discrimination, filed with the EEOC on November 7, 2005, states

the following:

> I worked for this employer as a Cashier.  In July 2005 I was physically attacked by
> a customer when he grabbed me and kissed me.  I wrenched away from him and
> went into the cooler and locked the door.   A make co-worker got the keys to the
> cooler and gave them to the attacker who continued to pursue me and attack me.  I
> reported the incident to the Owner who promised me the attacker would be
> banned from the property via a restraining order and the co-worker would be fired.
> He promised to let me know what was going on.  Based on that promise I
> continued to work there.   The Owner did not let me know what was going on, and
> several days later I was informed by the Assistant Manager that the co-worker had
> been fired on good terms and had been given a glowing letter of reference.  The
> attacker had received no restraining order.  Because of the discriminatory
> treatment and the employer's failure to provide a safe workplace I quit my job on
> July 28, 2005.
>
> I believe I have been discriminated against because of my Sex/Female - Gender in
> violation of Title VII of the Civil Rights Act of 1964, as amended, and the Utah
> Antidiscrimination Act of 1965, as amended.

Title VII requires a plaintiff to exhaust her administrative remedies before filing suit.

*Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007); *MacKenzie v. City & County of*

*Denver,* 414 F.3d 1266, 1274 (10th Cir.2005).   In the Tenth Circuit, exhaustion of administrative

remedies is a jurisdictional prerequisite to suit.  *See id.*  The first step to exhaustion is the filing

of a charge of discrimination with the EEOC.   *See id.* (citing *Jones v. Runyon,* 91 F.3d 1398,

1399 n.1 (10th Cir.1996) (noting that, although a *timely* filing is not jurisdictional in nature, the

filing itself is a jurisdictional requirement under this Court's precedent)).

The court's inquiry is limited to the scope of the administrative investigation that can

reasonably be expected to follow from the discriminatory acts alleged in the administrative

charge.  *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005);

*Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir.2003) (quoting *Nat'l R.R. Passenger Corp. v.*

*Morgan,* 536 U.S. 101, 114 (2002)).

Ms. Leautaud's EEOC charge includes no allegations that suggest she endured a hostile

work environment other than the July 22, 2005 incident.   Instead, Plaintiff alleged only that she

was attacked by a customer on July 22, 2005, with the assistance of her co-worker, and then she

complains that her employer failed to get a restraining order.   The charge implies that she seeks

to hold her employer liable under a third-party harassment theory, as set forth in *Lockard v. Pizza*

*Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998).

The court finds that her EEOC Charge cannot be read reasonably to suggest that Ms.

Leautaud sought to assert a claim for hostile work environment discrimination other than what

she endured on July 22, 2005.  There is no reason that the EEOC or Market Express would have

been on notice to investigate a pervasive hostile work environment claim that involved Mr.

Madsen's conduct prior to the July 22, 2005 Incident.

Accordingly, to the extent Ms. Leautaud has relied on the previous conduct of Mr.

Madsen to establish a hostile work environment claim, the court finds that she failed to exhaust

her administrative remedies for the claim, and thus her hostile work environment claim based on

anything other than the July 22, 2005 Incident must be dismissed.   The court will consider only Ms. Leautaud's claim of hostile work environment based on the July 22, 2005 incident (a *Lockard*-type claim) and her claim for constructive discharge, which the court finds can reasonably be inferred from her EEOC Charge.

**B.      Ms. Leautaud Has Failed to Create a Genuine Issue Concerning Her Hostile Work Environment Claim**

*1.      Ms. Leautaud Has Not Created a Genuine Issue of Material Fact About Whether Market Express Is Liable for the July 22, 2005 Incident*

It appears from Plaintiff's EEOC Charge and the majority of her briefing in this matter that the crux of her lawsuit is a claim for third-party harassment by a customer.   While there is legal precedent for such a claim, *see Lockard v. Pizza  Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998), and plaintiff relies heavily on *Lockard*, the instant case is materially distinguishable from the *Lockard* case.

In *Lockard*, the plaintiff worked at Pizza Hut.  Two men had been in the restaurant several times prior to November 6, 1993, they and had made sexually offensive remarks to Ms. Lockard.   *See Lockard,* 162 F.3d at 1067.  After these comments were made, the plaintiff told her supervisor, Mr. Jack, that she did not like to wait on these men.   *Id*.   When the men came into Pizza Hut again on November 6, 1997, the wait staff argued about who would have to wait on them, and Mr. Jack told the plaintiff to do so.   *Id*.   When she seated the men, one of them told her that she smelled good and asked what cologne she was wearing.   She said it was none of his business, and he grabbed her hair.   *Id*.   She reported this to Mr. Jack and told him that she did not want to wait on these men, but he insisted that she do so.   *Id*.   He stated, "You wait on them. You were hired to be a waitress.  You waitress." *Id*.   When the plaintiff returned to the table,

one of the men pulled her to him by the hair, grabbed her breast, and put his mouth on it.   *Id*. The plaintiff told Mr. Jack that was she quitting and left.

In that case, the court stated that "[a]n employer who condones or tolerates the creation of a [hostile work] environment should be held liable regardless of whether the environment was created by a co-employee or nonemployee, since the employer ultimately controls the conditions of the work environment."   *Id*. at 1073-74.   The Tenth Circuit found that "employers may be held liable in these circumstances if they "fail to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known."   *Id.* at 1074 (internal quotations and citation omitted).

The instant case bears no legal or factual resemblance to *Lockard*.   Here, while Mr. Marvidikis had apparently kissed Plaintiff against her will prior to July 22, 2005, Plaintiff admits that she never told anyone about this incident.   She had never complained to anyone about Mr. Marvidikis, and indeed, she did nothing to let Mr. Madsen know on July 22, 2005 that she was uncomfortable around Mr. Marvidikis.   There was nothing that her employer did to condone or create this situation.[5]   Despite Plaintiff's argument to the contrary, Market Express had no reason to know that Mr. Marvidikis would sexually assault her, and no reasonable jury could find otherwise.   Market Express had no knowledge at all concerning Mr. Marvidikis' behavior toward Ms. Leataud.

Ms. Leautaud appears to argue that Mr. Kiahtipes should never have staffed her alone with Mr. Madsen, in light of  Mr. Madsen's conduct at McDonald's, and Mr. Kiahtipes should

---

[5]  In so finding, the court does not intend to minimize the gravity of this incident–undoubtedly it was traumatic for Ms. Leautaud–but these facts cannot be molded into a Title VII cause of action.

have known that Mr. Madsen would have allowed Plaintiff to be attacked in this way.[6]   The

court finds that no reasonable jury could so find.   Ms. Leautaud's attempt to weave the

McDonald's incident into evidence of previous sexual harassment of which Market Express

should have taken preventative measures is misplaced.   Further, Ms. Leataud has failed to create

a genuine issue regarding any connection between the McDonald's incident and Mr. Madsen's

willingness to give the key to Mr. Marvidikis on July 22.   The undisputed evidence demonstrates

that Mr. Madsen had no knowledge that Ms. Leautaud was uncomfortable around Mr.

Marvidikis.   There is no evidence whatsoever that Mr. Madsen knowingly participated in the

attack.   While Mr. Madsen made an error in judgment by giving a key to Mr. Marvidikis, Ms.

Leautaud has failed to create a triable issue regarding a Title VII violation.

> 2.   *Even if the Court Considered All Conduct Predating the July 22, 2005 Incident,*
> *Plaintiff Has Still Failed to Create a Triable Issue Regarding a Hostile Work*
> *Environment Claim*

The court has found that Plaintiff failed to exhaust her administrative remedies as to her

hostile work environment claim based on Mr. Madsen's alleged conduct prior to July 22, 2005.

Even if the court that evidence, however, Ms. Leautaud has still failed to create a triable issue

regarding her hostile work environment claim.

A hostile work environment is actionable when "the [sexual] conduct has the purpose or

effect of unreasonably interfering with an individual's work performance or creating an

intimidating, hostile or offensive work environment."   *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d

664, 672 (10th Cir. 1998).   To form the basis of this claim, the sexual harassment must be

"sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create

---

[6]   It bears noting that Ms. Leautaud has not pleaded or argued a state law negligent hiring
or negligent employment claim.

an abusive work environment.'"  *Id.* (internal citations omitted).  In addition, the environment

must be perceived as both subjectively and objectively abusive, based on a totality of

circumstances.  *Id.*

  Ms. Leautaud appears to argue that Market Express is liable for a hostile work

environment under both a direct (or negligence) theory of Title VII liability and also on a theory

of vicarious liability.   Because Ms. Leautaud's allegations are based on the conduct of Mr.

Marvidikis, a customer, and Mr. Madsen, a coworker, her claim is properly analyzed under a

direct theory of liability.[7]   She has failed to create a genuine issue as to whether Mr. Madsen was

her supervisor whose actions ought to be attributed to the employer, and thus the court finds that

there is no vicarious (or respondeat superior) liability.[8]

  Employers are not automatically liable for harassment perpetrated by their employees.

*Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001).  "An employer is negligent with

respect to sexual harassment if it knew or should have known about the conduct and failed to

stop it."  *Burlington Indus. Inc v. Ellerth*, 524 U.S. 742, 759 (1998); *see also Hollins*, 238 F.3d at

1258 (stating that to prevail on a negligence-based hostile work environment claim, a plaintiff

bears the burden of establishing that the employer's conduct was unreasonable).  An employer,

---

 [7]  As the Tenth Circuit has pointed out, "vicarious liability applies to situations in which a supervisor perpetrates harassment himself, whereas a theory of direct liability is more appropriate where an employer fails to respond adequately to harassment of which a management-level employee knew or should have known."  *Deters v. Equifax Credit Info. Servs*, 202 F.3d 1262, 1270 n.3 (10th Cir. 2000).

 [8]  Because the court finds that there is no vicarious liability, Ms Leautaud's Motion for Partial Summary Judgment regarding Market Express' affirmative defenses based on Burlington/Faragher are moot, as those only apply in a vicarious liability analysis.   Thus, Plaintiff's Motion for Partial Summary Judgment is denied as moot.   *See Burlington Indus.Inc v. Ellerth*, 524 U.S. 742, 761 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 777-78 (1998).

however, "is only obligated to respond to harassment of which it actually knew, or in the exercise of reasonable care should have known." *Adler*, 144 F.3d at 673.   Thus, "courts must make two inquiries: first, into the employer's actual or constructive knowledge of harassment and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." *Id.*

There is no evidence that a management-level employee witnessed any such harassment from Mr. Madsen.   The only complaint that Ms. Axelson ever received (beyond performance-related complaints) was that an employee named Alexis felt uncomfortable when Mr. Madsen watched her take the trash out at night.   Ms. Axelson talked to Mr. Madsen about this conduct, and there is no evidence that any problem remained.   Ms. Leautaud claims that she told Ms. Axelson that she was "uncomfortable" working with Mr. Madsen, but such a vague allegation, without more, cannot create a triable fact for summary judgment purposes.

Viewing the facts in a light most favorable to Ms. Leautaud, she also claims she told Ms. Felice, the assistant to Ms. Axelson, about the "Safe Incident, " that Mr. Madsen had pornography on his palm pilot, and that she felt "uncomfortable" working with him.   These allegations also are not sufficient because Ms. Leataud has failed to create a triable fact as to whether Ms. Felice was a management-level employee whose knowledge should be imputed to the employer.   The Tenth Circuit has found that even "an employee who is a 'low-level supervisor' may also be a management-level employee for purposes of imputing knowledge to the employer when he is titled supervisor and has some authority over other employees." *Wilson v. Tulsa Junior College*, 164 F.3d 534, 542 (10th Cir. 1998).   Ms. Leautaud, however, has not marshaled any evidence demonstrating that Ms. Felice had any authority to affect any terms or

21

conditions of Ms. Leautaud's–or anyone else's–employment, and Ms. Felice's self-titled position

of "assistant to the manager" has no meaning in the Title VII context.

Accordingly, even if the court were to consider all of Ms. Leautaud' s evidence of a

hostile work environment (creating a claim that was not mentioned in her EEOC Charge),

Plaintiff has not created a triable issue regarding whether Market Express knew or should have

known about Mr. Madsen's behavior and then failed to stop it.  Thus, her claim for hostile work

environment would be dismissed in any event.

**C.**    **Ms. Leautaud Has Not Created a Genuine Issue Regarding Her Constructive**
         **Discharge Claim**

There is no triable issue as to whether Ms. Leautaud was constructively discharged, as no

reasonable jury could so find.  An "employee is constructively discharged when the employer by

his illegal discriminatory acts makes 'working conditions so difficult that a reasonable person in

the employee's position would feel compelled to resign."  *Hall v. U.S. Dep't of Labor*,  476 F.3d

847, 851 (10th Cir.  2007).

Ms. Leautaud bases her constructive discharge on the fact that her employer did not

obtain a restraining order against Mr. Madsen or Mr. Marvidikis.   There is no indication that

such an act would have even been possible given the standards for obtaining a restraining order,

and indeed, there is evidence that an attempt to obtain such restraining orders would have been

futile.  Ms. Leautaud claims that she tried to obtain a restraining order herself but was

unsuccessful.  It is unclear why Ms. Leautaud believes that her employer should have taken this

action when she knows that she could not have obtained herself.

Given the undisputed evidence, no reasonable jury could find that Market Express made

the working conditions so difficult that a reasonable person in Ms. Leautaud's situation would

feel compelled to resign.  It appears that Market Express did everything one could expect an employer to do in this situation.  Thus, Ms. Leautaud's constructive discharge claim is dismissed.

**D.     Granting Summary Judgment Is Not Unconstitutional**

Ms. Leautaud argues that she is entitled to a jury trial regardless of the evidence and that granting summary judgment is unconstitutional.   Courts routinely grant summary judgment when it is warranted, and appeals courts–including the United States Supreme Court–routinely uphold the granting of summary judgment.   Plaintiff has failed to cite any support for this unusual proposition, and the court finds no merit to such an argument.

## V.  CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that Defendant Market Express, Inc.'s Motion for Summary Judgment [docket # 25] is GRANTED, and Plaintiff Sarah Leautaud's Motion for Partial Summary Judgment [docket #27] is DENIED AS MOOT. Plaintiff's Motion to Strike Witnesses [docket # 39] is MOOT.  This action is DISMISSED with prejudice.  Each party is to bear her/its own costs.

DATED this 17th day of January, 2008.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge